IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) ADAM V. REED, an individual, | ) | |
| | ) | |
| PLAINTIFF. | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-178-CVE-PJC |
| | ) | |
| (1) BEN E KEITH COMPANY, | ) | |
| | ) | |
| DEFENDANT. | ) | |

---

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

---

DOERNER, SAUNDERS, DANIEL &
ANDERSON, L.L.P.

Kristen L. Brightmire, OBA No. 14239
Rebecca D. Stanglein, OBA No. 22723
Williams Center Tower II
Two West Second Street, Suite 700
Tulsa, OK  74103-3117
Telephone (918) 582-5204
Facsimile (918) 925-5204
kbrightmire@dsda.com
rstanglein@dsda.com

*Attorneys for Defendant*

# TABLE OF CONTENTS

I. STATEMENTS OF FACT ........................................................................................................ 2

    A.   Information about Ben E Keith and its Positions ................................................................ 2

    B.   Reed's Job as a Driver for Ben E Keith ............................................................................. 2

    C.   Reed's Injury and Resulting Permanent Work Restrictions ............................................... 4

    D.   Reed's request to be transferred to the position of Shuttle Driver ..................................... 8

    E.   Reed's requests to be permanently assigned a Helper to enable him to return
         to a Driver position ......................................................................................................... 11

    F.   Reed's employment with another company and termination with Ben E Keith
         as a result ........................................................................................................................ 12

II. SUMMARY JUDGMENT STANDARD ................................................................................ 13

III. ARGUMENTS AND AUTHORITIES .................................................................................. 13

    A.   Reed cannot establish his prima facie case. ..................................................................... 13

         1. Reed was not qualified within the meaning of the ADAAA. ....................................... 14

             a.  Assigning Reed a helper on a permanent basis is not a reasonable
                accommodation as a matter of law ........................................................................ 14

             b.  Transferring Reed to the position of Shuttle Driver was not a reasonable
                accommodation. .................................................................................................... 16

                i.   Reed has no evidence there was a vacant Shuttle Driver position .................. 16

                ii.  Reed was not qualified with or without a reasonable accommodation
                   to perform the essential functions of a Shuttle Driver. ................................... 17

         2. Reed cannot prove he was discriminated against because of his disability .................. 20

    B.   Assuming arguendo Reed could prove a prima facie case, he cannot prove pretext ........ 21

    C.   Reed's claim that BEK failed to engage in the interactive process in good faith
         is a red herring that cannot defeat summary judgment. ..................................................... 22

IV. CONCLUSION ..................................................................................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Adair v. City of Muskogee*, 823 F.3d 1297 (10th Cir. 2016)............................................. 13, 17, 24

*Iverson v. City of Shawnee,* 332 Fed.Appx. 501 (10th Cir. 2009) ................................................. 24

*Duvall v. Georgia-Pacific Consumer Products, LP*, 607 F.3d 1255 (10th Cir. 2010) ................ 16

*EEOC v. Picture People, Inc.*, 684 F.3d 981 (10th Cir. 2012) ..................................................... 20

*Gandall v. FlightSafety Intern., Inc.* 2013 WL 2444715 (N.D. Okla. June 5, 2013) .................. 23

*Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999)............................................ 21

*Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877 (10th Cir. 2015) ................................... 17

*Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000) ................... 22

*Medearis v. CVS Pharmacy*, 646 Fed.Appx 891 (8th Cir. 2016) ................................................. 15

*Merrell v. ICEE-USA Corp.*, 242 F.3d 389 (10th Cir. 2000).................................................. 15, 23

*Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164 (10th Cir. 2006)....................... 21

*Murphy v. Samson Resources Co.*, 525 Fed.Appx. 703 (10th Cir. 2013).................................... 14

*Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249 (10th Cir. 2001)................................. 13

*Stern v. St. Anthony's Health Center*, 788 F.3d 276, 289 (7th Cir. 2015) ................................... 15

*Vinez v. Sky Chefs, Inc.*, ___ Fed.Appx. ___, 2016 WL 4258974

   (10th Cir. August 12, 2016) ...................................................................................................... 20

**Statutes**

42 U.S.C. § 12111(9) ..................................................................................................................... 14

42 U.S.C. § 12112......................................................................................................................... 1

**Rules**

29 C.F.R. § 396.15 ..................................................................................................................... 2, 7

FED.R.CIV.P. 56(a)........................................................................................................................ 13

Fed.R.Civ.P.56.............................................................................................................................. 2

**Regulations**

29 C.F.R. § 396.17 ......................................................................................................................... 7

Plaintiff Adam Reed worked as a delivery driver for Defendant Ben E Keith Company (BEK).  As such, he was required to have a commercial driver's license (CDL) and was responsible for pre-trip, post-trip, and other periodic inspections.  He would pick up his tractor and trailer in his hometown of Miami, OK, and then drive to Missouri each day to deliver refrigerated and dry goods to restaurants.  He would make 20-25 stops per day before returning home that evening.  At each stop, he would climb out of the tractor cabin, climb into the trailer, put down the ramp, load a dolly with product, scan the product, take the product into the restaurant and unload it in the proper location (e.g., freezer, storeroom).  He would repeat this process he estimates 200-300 times per day; in and out of the tractor and trailer, loading, unloading, and stacking products.

Mr. Reed was injured on the job in March 2013.  After two surgeries and a short return to work between the surgeries, on June 2, 2014, his physician placed upon him the following permanent restrictions: no prolonged standing, no prolonged walking, no kneeling, and no squatting.  BEK determined it could not reasonably accommodate these permanent restrictions.

Reed made two specific suggestions for accommodations.  Reed requested he be assigned on a permanent basis a second person, a loading assistant/helper, to accompany him on his route.  As an alternative accommodation, he requested reassignment to the position of Shuttle Driver.  BEK determined that these were not reasonable accommodations.  Reed took a job with another employer and has remained consistently employed since.  As a result of Reed's becoming employed with another company, BEK terminated Reed's employment.

Reed has sued BEK under the Americans with Disabilities Act, as amended ("ADAAA"), 42 U.S.C. § 12112, alleging that BEK fired him because of his disability instead of reasonably accommodating his permanent restrictions.  Doc. 2-1 at ¶ 8.

# I.  STATEMENTS OF FACT[1]

**A.      Information about Ben E Keith and its Positions**

1.      BEK is a distributor of foodservice products.  Maxberry Decl., Ex. 2 at 3.

2.      BEK has a job description for the position of Driver. In part, it describes the physical demands to include: "frequently is required to sit, stand; walk; and stoop, kneel, crouch or crawl. The employee is occasionally required to climb or balance."   It also advises that "reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions."  Ex. 3 at p. 2.

3.      BEK has a job description for the position of Shuttle Driver.  In part, it describes the physical demands to include:  "The employee frequently is required to sit, stand; walk; and stoop, kneel, crouch or crawl."  It is clear that "reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions."  Ex. 4 at p. 2.

4.      The job descriptions for the positions of Driver and Shuttle Driver are accurate descriptions of Reed's position of Driver and of the Shuttle Driver position in 2014.  Maxberry Decl., Ex. 2 at ¶¶ 6 and 19.

**B.      Reed's Job as a Driver for Ben E Keith**

5.      Reed lives in Miami, Oklahoma, where he has lived for approximately nineteen years.  Reed Depo., Ex. 1 at 5, ll. 3-4.

6.      Reed was a Driver for BEK out of its Miami yard.  Reed Depo., Ex. 1 at 37, l. 23, through 38, l. 4.

7.      Reed testified that, to learn the job of Driver, he rode with another driver for a while.  Reed Depo., Ex. 1 at 47, ll. 21-25.

---

[1] This statement of facts is in compliance with Fed.R.Civ.P.56 and LCvR 56.1.  BEK reserves the right to contest certain facts should the matter proceed to trial.

8. The Miami yard had 6-8 drivers according to Reed. Reed Depo., Ex. 1 at 38, ll. 9-13.

9. Drivers in the Miami yard officially reported to Tulsa. In Miami, there were no other employees, supervisors, etc. It was just a satellite location to leave personal vehicles, pick up the necessary keys, trucks, etc., and go to your route. Reed Depo., Ex. 1 at 38, l. 12, through 39, l.25.

10. Reed described a typical work day as arriving at the Miami yard around 1:30 a.m. or 2:00 a.m., grabbing keys or other needed codes for the restaurants on his route that day, getting into his tractor/trailer (already loaded with the products), and driving to Missouri. He would go to 20, 25, or more locations that day to deliver products. At each location, he would unlock them, turn the alarms off, and then open the freezers and coolers. Reed Depo., Ex. 1 at 41, l. 14, through 42, l. 18; p. 42, l.20 – p. 43, l.5.

11. Reed would then would pull the ramp out, set it up, and start unloading the products. Reed Depo., Ex.1 at 43, ll. 14-19. The ramp goes from the truck to the ground. Reed Depo. Ex. 1 at 43, ll. 20-24. He had to scan all the products as he went; then, after unloading the products in the restaurants, stacking them in the appropriate location such as the cooler or freezer, he locked the building back and went to the next stop. Reed Depo., Ex. 1 at 44, l. 19, through 46, l. 14.

12. Reed testified that at a single stop he would unload a "couple hundred cases." Reed Depo., Ex. 1 at p. 45, ll. 7-14.

13. Reed testified that at a single stop he would go in and out of the customer's business (unloading these cases using a dolly) 40 to 50 times. Reed Depo., Ex. 1 at 45, ll. 15-25.

14.     If there were extra products left over at the end of the day's route, he would unload his trailer and load the extra products onto a different trailer set up in the Miami yard (for another driver to transport).  Reed Depo., Ex. 1 at 47, ll. 2-5.

15.     As a CDL driver, he was required to do pre-trip and post-trip inspections, which included inspecting the lights, tires, and loads.  Reed Depo., Ex. 1 at p. 48, l. 13 through p. p. 49, l. 1.

16.     Reed also had to check the load as a Driver.  Reed Depo., Ex. 1 at 49, ll. 2-21.

**C.     Reed's Injury and Resulting Permanent Work Restrictions**

17.     On or about March 13, 2013, Reed stepped on a patch of ice and slipped, injuring his knee.  Reed Depo., Ex. 1 at p. 51, ll. 16-22.

18.     Reed was off work due to that injury until after surgery. His surgery was in April 2013; he continued to be off approximately 6 weeks for recovery.  Reed Depo., Ex. 1 at p. 51, l. 23 through p. 52, l. 12.

19.     Reed returned to work in late May 2013.  Reed Depo., Ex. 1 at p. 52, l. 23 through p. 53, l. 1.

20.     Reed tried on his first day back to do the job but found it too painful.  He called his supervisor and said he needed help.  Reed Depo., Ex. 1 at p. 53, l. 17 through p. 54, l. 7.

21.     Reed was assigned a helper.  He could not recall the name of the person, but described him as a white male in his mid-30s, ex-Army, who did not have his CDL.  Reed Depo., Ex. 1 at p. 54, l. 8 through p.  55, l. 14.  (For purposes of the deposition and this motion, he is referred to as "Army.")

22.     Army was assigned to the Tulsa yard, not Miami.  Reed Depo., Ex. 1 at p. 55, l. 24 through p. 56, l. 6.

23.     Reed testified: "when [Army] was helping me, I was actually driving the Ben E. Keith to Tulsa.  They were arranging to where I was delivering in Tulsa."  "I would drive the Ben E. Keith tractor to Tulsa and deliver here to Tulsa. … so I'd be close to around --- around them."  Reed Depo., Ex. 1 at p. 56, ll. 3-15.

24.     Reed testified he was provided this helper for "three, four weeks."  Reed Testimony, Ex. 5 at p. 15, ll. 15-20.

25.     The temporary accommodation provided by BEK was as follows.  In the morning, Reed would drive his personal vehicle to the Miami yard.  He would pick up the BEK tractor (not the trailer) and drive it to Tulsa.  There, he and Army would hitch the trailer (with the products) to the tractor and deliver in the Tulsa area.  As only Reed had a CDL, he would drive.  Reed would get into the trailer, scan and load products onto the dolly.  Army would wheel the products into the restaurant and unload the products.  Reed Depo., Ex. 1 at p. 57, l. 1 through p. 58, l. 2; p. 62, ll. 2-20.

26.     After this ended, Reed returned to work at the Miami yard until December 2013.  Reed Depo., Ex. 1 at p. 61, ll. 3-5.

27.     In December 2013, Reed testified that his new doctor "took him off work."  Reed Depo., Ex. 1 at p. 63, l. 21 through p. 64, l. 1.

28.     On December 2, 2013, Dr. Dukes issued a note with the following work restrictions:  no prolonged standing or walking, no kneeling, no squatting, no climbing, no stooping, no excessive bending, no twisting, and a brace was required for work.  Ex. 6.

29.     BEK reviewed the December 2013 restrictions and determined it could not reasonably accommodate those restrictions.  Turman Decl., Ex. 7 at ¶¶ 9-10.

30.     BEK communicated this to Reed's attorney.  Ex. 8.

5

31.     On February 13, 2014, Reed had a second surgery.  Ex. 9; Reed Depo., Ex. 1 at 64, ll. 6-8.

32.     On May 5, 2014, Reed received temporary restrictions noting he could return to work but to a "sit down job only."  Ex. 10.

33.     Reed called Safety Manager Marvin Turman about returning to work, but BEK determined it could not accommodate those work restrictions.  Turman Decl., Ex. 7 at ¶ 12.

34.     Reed understood this was BEK's position.  He testified:

Q       … I know at one time there's a note that says you have to have a job that requires full time sitting and Ben E. Keith says that can't do that.  Do you recall that?

A       (Witness nods head.)

Q       … do you recall that?

A       Well, he said light duty.

Q       Okay.

A       I can return back for light duty.

Q       Okay.  And Ben E. Keith says that they don't have anything?

A       Yes.

Reed Depo., Ex. 1 at p. 64, l. 15, through p. 65, l. 1.

35.     On June 2, 2014, Reed's doctor issued Reed permanent restrictions (**Restrictions**) which included:

> No prolonged standing or walking
> No kneeling
> No squatting

Ex. 11.

36.     From the parking lot of his doctor's office in Tulsa on June 2, 2014, Reed called his supervisor about returning to work.  His supervisor said he was to call the safety supervisor in

Edmond.  While these calls were going on, Reed drove to the Tulsa yard to show the Restrictions to his supervisor.  Reed Depo., Ex. 1 at p. 70, l. 23 through p. 73, l. 2.  Reed may *or may not* have given a copy of the Restrictions to his supervisor at that time.  Reed Depo., Ex. 1 at p. 72, ll. 15-20.

37.     After a few calls to both his supervisor and the safety supervisor, the safety supervisor asked him if he was represented by legal counsel, to which Reed said he was.  The safety supervisor then said they needed to "let them deal with it."  Reed Depo., Ex. 1 at p. 69, ll. 5 -23.

38.     Reed's position as a Driver was covered by the Department of Transportation (DOT) regulations.  Maxberry Decl., Ex. 2 at ¶ 5; Turman Decl., Ex. 7 at ¶ 4.

39.     DOT regulations require Drivers to conduct pre-trip and post-trip inspections, 29 C.F.R. § 396.15, as well as periodic inspections, 29 C.F.R. § 396.17.  These inspections require the drivers to physically inspect the trucks, tow bars, etc.  Turman Decl., Ex. 7 at ¶ 6.

40.     As a matter of BEK's internal policies and practices, it requires its drivers to regularly inspect the vehicle's equipment including tires, lights, and brakes to ensure they are in proper working condition.  This is set forth in the job description for a Driver.  To conduct these inspections, the driver often has to kneel and squat at various locations around the vehicle to conduct visual inspections.  Turman Decl., Ex. 7 at ¶ 7.

41.     Given the totality of the job's requirements, with his permanent restrictions, Reed could not perform the essential functions of the position of Driver which required standing, walking, kneeling, and squatting on a regular basis.  Turman Decl., Ex. 7 at ¶ 15; Maxberry Decl., Ex. 2 at ¶ 5, 7-8, 11-12.

42.     Even Reed has testified he could not return to the position of Driver with the permanent work restrictions.

> Q.     And, were you able to return to the same type of work as a delivery driver for Ben E. Keith with those restrictions place[d] on you by Dr. Dukes?
>
> A.     No.

Ex. 5, p. 16, ll. 12-20.

**D.     Reed's request to be transferred to the position of Shuttle Driver**

43.     On June 20, 2014, Reed requested to be assigned the position of a Shuttle Driver. Reed Depo., Ex. 1 at p. 75, l. 22 through p. 76, l. 11.

44.     Reed had no actual knowledge there was a vacancy for a shuttle driver.  Reed Depo., Ex. 1 at p. 79, l. 22 through p. 80, l. 14.

45.     Reed *believes* there *may* have been an opening because (i) the company had general advertising; e.g., placards on trucks driving around that people should call "now hiring" and (ii) he believed because BEK was going to get a new customer (Sonic) and he thought that might lead it to add additional shuttle drivers.  Reed Depo., Ex. 1 at p. 79, l. 22 through p. 80, l. 14; p. 95, l. 10 through p. 96, l. 24.

46.     Reed has made statements that BEK hired two Shuttle Drivers in the Miami yard after his Restrictions.  However, when asked about the basis of this belief, he testified that it was based upon nothing more than his driving by the Miami yard and seeing more vehicles there. Reed Depo., Ex. 1 at P. 98, l. 12 through p. 99, l. 4.

47.     When pressed, Reed admitted he had no evidence of any Shuttle Drivers having been added, specific to the new business he believed BEK was getting.

> Q     Do you know when the – well, if or when a shuttle driver position was added to the Miami location because of the Sonic Drive-in work?
>
> A     Not for certain, no.

Q     And when you say not for certain, do you have any information about this?

A     No.

Reed Depo., Ex. 1 at p. 97, ll. 15-21.

48.     Reed testified that BEK's response to his request to be transferred to Shuttle Driver included that BEK "[d]idn't have anything."  Reed Depo., Ex. 1 at 83, ll. 5-9.  Reed went on to testify that he was told (by his attorney) that the company had said "there's not a position open."  Reed Depo., Ex. 1 at 84, ll. 15-21.

49.     In fact, on June 20, when Reed made his request, there were no vacant Shuttle Driver positions in Miami or even in Tulsa.  There were no vacant Shuttle Driver positions in all of June or even July, 2016.  Dorsey Decl., Ex. 12 at ¶¶ 3-4.

50.     Reed had never worked as a Shuttle Driver.  Reed Depo., Ex. 1 at p. 76, l. 12 through p. 77, l.1.

51.     Reed's understanding of what a Shuttle Driver's job duties were was based upon general conversations he had with the Shuttle Drivers with whom he interacted when he might run into them as they would drop trailers or pick trailers up at the Miami yard.  Reed Depo., Ex. 1 at p. 77, l. 2, through p. 78, l. 4.

52.     Reed testified that he had not talked with any of these Shuttle Drivers since he was last actually working at the Miami yard – which would have been prior to December 2, 2013.  Reed Depo., Ex. 1 at p. 78, ll. 5-20.

53.     The Shuttle Driver DOT position requires the "employee frequently [to] sit, stand; walk; and stoop, kneel, crouch or crawl."  This is taken from the job description and is an accurate reflection of that position in 2013-2014.  Maxberry Decl., Ex. 2 at ¶¶ 19-20

54.     While it is true the Shuttle Driver's primary duty is not customer deliveries, Shuttle Drivers do make deliveries to customers.  Their primary responsibilities are to deliver the product to the yards (to the Drivers) and to take return products back to the warehouse.  There, the Shuttle Driver is responsible for unloading and stacking the returned products, which is physical work often requiring kneeling and squatting.  Maxberry Decl., Ex.2 at ¶ 21.

55.     Like the position of Driver, the position of Shuttle Driver is covered by DOT regulations.  Its regulations require pre-trip, post-trip, and periodic inspections.  Turman Decl., Ex. 7 at ¶¶ 5-6; Maxberry Decl., Ex. 2 at ¶ 22.

56.     Like the position of Driver, the job description of Shuttle Driver requires the driver to regularly inspect the vehicle's equipment including tires, lights, and brakes to ensure they are in proper working condition.  To conduct these inspections, the driver often has to kneel and squat at various locations around the vehicle to conduct the visual inspection.  Turman Decl., Ex. 7 at ¶ 7.

57.     Other BEK Shuttle Drivers often kneel or squat to perform their regular work duties, including DOT-required or company-required inspections and including the loading or unloading of products.  Vaughn Decl., Ex. 17 at ¶¶ 4-6; Yokum Decl., Ex. 18 at ¶¶ 4-6.

58.     With his permanent restriction, Reed could not perform the essential functions of the position of Shuttle Driver.  Maxberry Decl., Ex. 2 at ¶ 23; Turman Decl., Ex. 7 at ¶ 16.

59.     Reed testified that he learned from his attorney that the company had communicated that, as to an accommodation, "That's not going to work."  Reed Depo., Ex. 1 at p. 84, ll. 22-25.

60.     Reed was copied on the June 30, 2014, letter in which his attorney confirmed BEK's position that "Ben E Keith Company has no work available accommodating the restrictions placed on Mr. Reed by his treating surgeon."  Ex. 13.

**E.     Reed's requests to be permanently assigned a Helper to enable him to return to a Driver position**

61.     Reed requested that BEK permanently assign to him a helper to work with him in his Driving position.  Reed believed that it was reasonable because he believed (i) BEK had done it before and (ii) he *thought* helpers were common at BEK.  Reed Depo., Ex. 1 at 86, ll. 1-9.

62.     As to Reed's personal experience with Army, Reed admitted that – other than his weeks with Army in May 2013 – he had no idea of Army's work duties, rotation, etc. Reed Depo., Ex. 1 at p. 87, l. 17 through p. 89, l. 1.

63.     In 2013 and 2014, BEK did not employ any helpers for any Drivers in Miami. Reed Depo, Ex. 1 at p. 61, ll. 8-10 (Q: "were there any helpers that worked in Miami regularly?" "A. No."); *see also*, Maxberry Decl., Ex. 2 at ¶ 16.

64.     Reed testified he knew of *no* Driver in the Miami yard ever having the benefit of a helper.  Reed Depo., Ex. 1 at p. 89, ll. 10-113.

65.     Reed testified he was only aware of one helper that was employed in the Tulsa yard even - Army.  Reed Depo., Ex. 1 at p. 61, ll. 21-23.

66.     At the time of his requested accommodation for a helper, Reed did not know if Army was still even employed by BEK.  Reed Depo., Ex. 1 at p. 88, ll. 1-10.

67.     BEK sometimes employs persons to do odd jobs while they are trying to obtain their CDL license.  During that time, they might help out a Driver (as in the case of helping Mr. Reed when he returned to work after his surgery).  They might run "hot shots" – immediate deliveries to customers made in vans which do not require CDLs.  They do all kinds of jobs.

11

These employees are not employed in the Miami yard, which is too small.  These employees are not "permanently" assigned as a helper or loading assistant for any Driver because having two employees permanently assigned to a route would make the cost of the route too expensive. Maxberry Decl., Ex. 2 at ¶ 17.

68.     BEK determined that assigning Reed a helper or loading assistant on a permanent basis was not a reasonable accommodation.  It would significantly raise the cost of the routes to which Reed was assigned.  There would be two people assigned to do one position. In Reed's case, it would also require the hiring of an additional person to the Miami yard.  Maxberry Decl., Ex. 2 at ¶ 15.

69.     Reed understood it was BEK's position that it could not accommodate his permanent restrictions as a Driver.  Reed Depo., Ex. 1 at p. 85, ll. 12-17.

**F.     Reed's employment with another company and termination with Ben E Keith as a result**

70.     Reed started working for another company in August 2014.  Reed Testimony, Ex. 5 at p. 20, ll. 1-4.

71.     However, he remained an active employee for BEK after August 2014.  Ex. 14.

72.     BEK's employee handbook states: "[e]mployees seeking outside employment, in addition to their current position with Ben E. Keith, first must receive approval from their immediate supervisor.  'Second' jobs are normally discouraged.  The physical and mental strain of a second job is considered detrimental to an employee's productivity at Ben E Keith." Employee Handbook, "Outside Employment," Ex. 15.

73.     Shortly after BEK became aware that Reed was employed at another company, BEK terminated his employment.  His second job was in violation of Company policy.  Reed

Testimony, Ex. 5, p. 19, l. 19 through p. 20, l. 4; Payroll Change Notice, Ex. 14; Ex. 15. As part

of the normal process, Reed was paid 80 hours vacation days upon his termination. Ex. 14

      74.    Reed admits no one at BEK ever made negative comments about his physical

impairment. EEOC Affidavit, Ex. 16 at p. 5.


## II. SUMMARY JUDGMENT STANDARD

      Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P.

56(a).


## III. ARGUMENTS AND AUTHORITIES

      To withstand summary judgment, Reed must first make out a prima facie case by

demonstrating: (1) he is disabled as defined by the ADAAA, (2) he was qualified, with or

without a reasonable accommodation, to perform the essential functions of the job, and (3) he

was discriminated against because of his disability. *See Adair v. City of Muskogee*, 823 F.3d

1297, 1304 (10th Cir. 2016). If Reed establishes his prima facie case, BEK must state a

legitimate, non-discriminatory reason for the alleged adverse employment action. *Selenke v.

Medical Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001). Then summary judgment

is warranted in favor of BEK unless Reed can prove that there is a genuine issue of material fact

as to whether the proffered reason for the employment action is pretextual. *Id*. at 1260.

**A.**      **Reed cannot establish his prima facie case.**

      For purposes of this motion, BEK will not dispute Reed is disabled under the ADAAA.

BEK submits Reed cannot establish the second or third prongs of his prima facie case.

1.      **Reed was not qualified within the meaning of the ADAAA.**

> As to the second element, determining whether an individual is
> "qualified" within the meaning of the ADA involves a two-part
> inquiry: 1) whether the individual can perform the essential
> functions of the job; and 2) if the individual is unable to perform
> the essential functions of the job, whether any reasonable
> accommodation by the employer would enable her to perform
> those functions. ... "'Essential functions' are 'the fundamental job
> duties of the employment position the individual with a disability
> holds or desires.'"

*Murphy v. Samson Resources Co.*, 525 Fed.Appx. 703, 706 (10th Cir. 2013)(citation omitted).

Reed was a Driver.  Reed was no longer qualified for that position.  Reed himself he could no longer do that job.

Reed testified to two accommodations he believed would allow him to remain employed with BEK: (a) have BEK assign him a helper on a permanent basis or (b) transfer him to the position of Shuttle Driver.  Neither of these is a reasonable accommodation.

a.      **Assigning Reed a helper on a permanent basis is not a reasonable accommodation as a matter of law.**

Reed believes it would have been a reasonable accommodation for BEK to assign to him a helper on a permanent basis.  This request is patently ***un***reasonable.

The ADAAA defines reasonable accommodation as including "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications or examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9).

Courts have consistently held that a reasonable accommodation does not include requiring an employer to provide an additional person to perform the essential functions of the

job.  *See e.g.*, *Medearis v. CVS Pharmacy*, 646 Fed.Appx 891, 896 (8th Cir. 2016) ("An employer is required neither to create and fund a position as an accommodation nor to re-allocate job duties in order to change an essential function."); *Stern v. St. Anthony's Health Center*, 788 F.3d 276, 289 (7th Cir. 2015) ("We have repeatedly held that '[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation.'" (Citation omitted)).

 A similar situation was presented to the Tenth Circuit in *Merrell v. ICEE-USA Corp.*, 242 F.3d 389 (10th Cir. 2000).  Merrell was a service representative for a company that supplies and services carbonated beverage machinery.  His job duties "consisted of delivering products, installing machinery, and maintaining equipment, most of which weighed more than forty pounds."  *Id*. at *3.  Merrell had medical restrictions which would not permit him to lift more than 35 pounds.  Merrell argued his employer "should have provided him with assistance."  *Id*. at *5.  Yet, because the Tenth Circuit concluded that regular lifting in excess of the 35 pounds was an essential function of the position, it further concluded "the only accommodation that would enable him to perform his job would require another employee to accompany him on most servicing calls."  *Id*.  In affirming summary judgment to the employer, the Tenth Circuit held

> Contrary to Merrell's assertion, **this is an unreasonable accommodation as a matter of law** because it creates an undue burden on ICEE.

*Id*. (emphasis added).  In *Merrell*, the accommodation requested was only that another employee accompanying Merrell on *most* servicing call. Reed requests even more.  Reed requests a helper every day, leaving at 1:30-2:00 a.m. for a route that takes him into Missouri for the entire day.

 According to Reed, his job is to drive to 20-25 locations, go in and out of his trailer 40-50 times at each of those locations (after having loaded the dolly), go down the ramp and into the customer's business, and unload a couple of hundred cases of products at each of those locations

– *every day*.  It is undisputed Reed could no longer perform the essential functions of the Driver position; else he would not have asked to be assigned a permanent helper.

Requiring BEK to hire and assign to Reed a second employee to go on his route with him is an unreasonable accommodation *as a matter of law*.

> **b.    Transferring Reed to the position of Shuttle Driver was not a reasonable accommodation.**

Reed also asks that he be transferred to the position of Shuttle Driver, believing *without evidence* that the Shuttle Driver position did not require standing, kneeling, or squatting.

Reed's claim fails for two reasons.  First, Reed has no evidence there was a vacant Shuttle Driver position to which he could have been transferred.  Second, even if there were, he was not qualified to perform the essential functions of that position.

> **i.    Reed has no evidence there was a vacant Shuttle Driver position.**

It is the law of the Tenth Circuit that "at the summary judgment stage, the plaintiff-employee bears the burden of specifically identifying a vacant position, reassignment to which would serve as a reasonable accommodation."  *Duvall v. Georgia-Pacific Consumer Products, LP*, 607 F.3d 1255, 1263 (10th Cir. 2010)("To survive summary judgment, Plaintiff must establish that he was qualified to perform an appropriate vacant job which he must specifically identify and show was available within the company at or about the time he requested reassignment.'" (Citation omitted)).

Reed merely guesses there might have been some openings for the Shuttle Driver position because he saw some new cars in the Miami yard, because he saw trucks driving around with placards saying "now hiring" (for what we don't know), and because he thought BEK might have gotten a new account which may have meant it might have needed to hire more employees.

That's a lot of speculation; that's not evidence.  The evidence in the record is that there were no Shuttle Driver vacancies in Miami or in Tulsa when he requested the accommodation.

Inadmissible speculation by Reed is not sufficient to create a triable issue.  Without such evidence, Reed's claim fails.

> ### ii.     Reed was not qualified with or without a reasonable accommodation to perform the essential functions of a Shuttle Driver.

Even if Reed had evidence of a vacant Shuttle Driver position, he has to prove he was qualified for that position with or without a reasonable accommodation.  He was not.  He had permanent restrictions of *no* kneeling or squatting.  To determine whether he was qualified, the Court must analyze the job's essential functions.

> Evidence of whether a particular function is essential to a job includes (but is not necessarily limited to) (1) the employer's judgment as to which functions are essential, (2) written job descriptions prepared before advertising or interviewing applicants for the job, (3) the consequences of not requiring the incumbent to perform the function, and (4) the current work experience of incumbents in similar jobs.

*Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877, 887 (10th Cir. 2015)(citation omitted).

To the extent that Reed's argument is premised upon disagreement regarding what constitutes the essential functions of the job position, Reed is not the one who decides the duties the employees must perform.

> [W]e defer to the employer's description. … As we have explained, "the essential function 'inquiry is not intended to second guess the employer or to require the employer to lower company standards.'" … Indeed, "[w]e will not second guess the employer's judgment when its description is job-related, uniformly enforced, and consistent with business necessity."

*Adair*, 823 F.3d at 1307-08 (citations omitted).

A review of the *Hawkins* factors supports BEK's position that kneeling and squatting are essential functions of the job of Shuttle Driver.  Because Reed was expressly prohibited from doing either, he was not qualified.

*The Employer's Judgment*.  In BEK's judgment, Reed was not qualified for the position with his permanent medical restrictions.  The job of Shuttle Driver is one that requires daily pre-trip and post-trip DOT inspections of the vehicle (truck and trailer; sometimes two trailers).  It requires periodic DOT inspections of the truck and trailers.  It requires general inspections of the vehicle for overall operational concerns. It requires the driver to unload returned products regularly and stack them in the warehouse.  Sometimes it requires the driver to make deliveries to customers (similar to a route Driver) which would involve loading and unloading products and delivering them into the customer's place of business.

In the employer's judgment, Reed was not qualified.  Inspections must be done to comply with DOT regulations and company safety rules.  Given the small number of employees in the Miami yard, there are not sufficient employees to cover should a Shuttle Driver need to make a delivery.  Like with the Driver position, the only way to ensure these tasks are done if Reed were transferred would be the ***un***reasonable accommodation of hiring a second person to accompany him at all times.

*Written Job Descriptions*.  The job description for the position plainly states the Physical Demands require the employee to "stoop, kneel, crouch".  Ex. 4.  While the job description does not use the word "squat," when you type "crouch synonym" into Google, the first synonym listed is, in fact, "squat."[2]  The job description notes the following "Duties and Responsibilities"

---

[2] *See*
https://www.google.com/search?q=crouch+synonym&sourceid=ie7&rls=com.microsoft:en-US:IE-SearchBox&ie=&oe= (last visited September 2, 2016)

- Perform duties by following the Company's safety standards and wearing the proper safety equipment
- Delivery of equipment and product along assigned routes consisting of multiple combinations of vehicles with various levels of difficulty
- Unload all returned products and place them in appropriate areas assigned by management …
- Responsible for restacking of pallets that fall during transitions
- Responsible for interior and exterior washing and cleaning of trailers …
- Inspect and maintain vehicle supplies and equipment, such as gas, oil, water, tires, lights and brakes in order to ensure that vehicles are in proper working condition …
- May be required to run delivery routes

Ex. 4, pp. 1-2.  The job description is clear.  This is a physical job.  Performing the tasks listed require kneeling and squatting.

*Consequences of Not Requiring the Performance*.  If BEK did not require Reed to kneel or squat, he could not fulfill the DOT inspections which would violate the law.  These inspections are mandated; reports are required.  This is not simply not an option.

Additionally, the job description requires the Shuttle Drivers to inspect the vehicles for safety reasons.  BEK is interested in ensuring the safe operation of their vehicles at all times.  If a Shuttle Driver cannot squat down to check the tires, brakes, etc., he is not able to ensure his vehicle is in good working order before he gets on the road.  This is a safety issue.

The work issues of not being able to unload the products, restack the pallets, make the deliveries when necessary, and the like are also unacceptable consequences.

*Concurrent Work Experience of Incumbents*.  The other Shuttle Drivers regularly walk and stand, and certainly kneel and squat.  *See* Vaughn and Yokum Decls., Exs. 17 and 18.

BEK has presented documents and sworn testimony as to the essential functions of the position.  Reed has nothing but his belief that a Shuttle Driver's job is easier than that of a Driver.  That's not enough to defeat summary judgment.

19

**2.      Reed cannot prove he was discriminated against because of his disability.**

Before even proceeding to this question, Reed must show he was qualified. *EEOC v. Picture People, Inc.*, 684 F.3d 981, 988 (10th Cir. 2012). Reed was not qualified.

Even assuming Reed had presented evidence he was qualified, he has presented no evidence he was discriminated against because of his disability. Reed was not returned to work when he presented his permanent work restrictions because BEK could not reasonably accommodate those restrictions. He remained on leave. It was not until BEK learned that Reed had taken a job elsewhere that it took steps to discharge Reed. As was the norm, BEK paid him 80 hours of vacation pay upon his termination.

Notably, Reed admits no one at BEK ever made negative comments about his physical impairment.

In the Tenth Circuit, this evidence is wholly insufficient to satisfy the third prong of the prima facie case.

> The third element requires [plaintiff] show [he] was laid off "under circumstances which give rise to an inference that the termination was based on [his] disability." … "This burden is not onerous, but it is also not empty or perfunctory." … It "**requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision**."

*Vinez v. Sky Chefs, Inc.*, ___ Fed.Appx. ___, 2016 WL 4258974, *2 (10th Cir. August 12, 2016) (citations omitted)(emphasis added). Ms. Vinez presented evidence that the reasons given for her termination were false. The Court found that such was insufficient to make her prima facie case. In affirming summary judgment to the employer, the Court noted that "without some affirmative evidence that her disability was a determining factor in [the] decision to terminate her, this evidence of pretext alone fails to show that she was laid off under circumstances giving rise to an inference of discrimination." *Id.* at *3.

Reed can present no affirmative evidence that his disability was a determining factor in BEK's decision to discharge him.  Without such, Reed's claim fails as a matter of law.

**B.      Assuming arguendo Reed could prove a prima facie case, he cannot prove pretext.**

Even assuming *arguendo* Reed was able to prove a prima facie case of discrimination—which BEK vehemently disputes—BEK has established a legitimate, non-discriminatory reason for Reed's termination.  BEK was unable to reasonably accommodate his permanent medical restrictions.  Reed was on unpaid medical leave.  Reed applied for and obtained other employment.  After BEK learned he was employed elsewhere, BEK terminated his employment for violating company policy.  Violation of company policy is a legitimate, non-discriminatory reason for discharging an employee.

BEK's Employee Handbook requires that "[e]mployees seeking outside employment, in addition to their current position with Ben E. Keith, first must receive approval from their immediate supervisor.  'Second' jobs are normally discouraged.  The physical and mental strain of a second job is considered detrimental to an employee's productivity at Ben E Keith."  Employee Handbook, Ex. 15 at p. BEK-000027.

In order to survive summary judgment, Plaintiff must prove that BEK's reasons for the termination of his employment decision were pretextual—meaning that they were so incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude such reasons were unworthy of belief.  *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1172 (10th Cir. 2006).  It is not the province of the Court, however, to decide whether BEK's reasons for such decision were "wise, fair, or even correct" so long as they were the true reasons for the decision.  *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076, 1083 (10th Cir. 1999).  A challenge of pretext requires the Court to look at the facts as they appeared to BEK when making its

employment decision.  *Kendrick v. Penske Transportation Services, Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

As a final aside, there is a complete absence of any allegations of discriminatory animus. Indeed in his EEOC filings, Reed noted no one from BEK had ever made any negative comments to him about his medical condition.  Ex. 16 at p. 5.  There is no evidence BEK's termination of Reed when he took a job elsewhere was a pretext for disability discrimination.

C.      **Reed's claim that BEK failed to engage in the interactive process in good faith is a red herring that cannot defeat summary judgment.**

There is no evidence BEK failed to engage in the interactive process in good faith.  Even if there were, the ADAAA does not provide a cause of action against an employer for failing to engage in the interactive process.

Here is the evidence.  The parties had been involved in ongoing communications from the date of his injury forward (including two surgeries and multiple return to work releases). BEK had been reviewing the situation on an ongoing basis.  When the permanent restrictions were received in early June 2014, BEK had already given considerable thought to the issue. Unfortunately, there was no way for Reed to work as a Driver (or a Shuttle Driver) with the permanent restrictions he was given; he simply was not qualified to perform the essential functions and there were no reasonable accommodation to be had.

The evidence is that BEK did communicate – though not in writing – to Reed's workers' comp attorney.  Through the writings of Reed's attorney, the Court can see some of those communications:

> [In response to the December 2, 2013, restrictions, Reed's attorney emails] "Today his employer sta[tes] it cannot accommodate these restrictions."  Ex. 8.

> [In response to suggested accommodations to Reed's June 2, 2014, permanent restrictions, Reed's attorney sends a letter on June 30,

> 2014] "Confirming our telephone conversation, **you have advised that Ben E Keith Company has no work available accommodating the restrictions placed on Mr. Reed** by his treating surgeon." Ex. 13.  (emphasis added).

Reed himself then confirms another call after the June 2 letter when he submits an affidavit to the EEOC stating that his requested accommodation was

> never denied in writing. Only a call to my attorney around 7/3/14

Ex. 16 at p. 5.

Conversations were occurring.  Reed's testimony establishes that he knew BEK's positions on his requested accommodations.  BEK was reviewing the restrictions, making determinations, and communicating those determinations.  Liability cannot be established because BEK failed to memorialize its communications in letters or emails.

Even if Reed argues BEK should have been *a better communicator* (perhaps it should have reduced each and every communication to a formal letter to Reed), that does not establish liability or defeat this motion for summary judgment.  Failure to prove that additional interaction would have resulted in an actual reasonable accommodation dooms Reed's argument.

> It is well-established that "even if the employer failed to sufficiently engage in the interactive process, the employer can still prevail on summary judgment if the employee failed to 'show that a reasonable accommodation was possible and would have led to a reassignment position.'" *Frazier v. Simmons*, 254 F.3d 1247, 1261 (10th Cir.2001) (quoting *Smith v. Midland Brake, Inc*., 180 F.3d 1154, 1174 (10th Cir.1999) (en banc)). As noted above, *Gandall* failed to present evidence that he was qualified for any particular, available position.

*Gandall v. FlightSafety Intern., Inc*. 2013 WL 2444715, *7 (N.D. Okla. June 5, 2013); *see also Merrell*, 242 F.3d 389, *5 ("Because Merrell cannot show that a reasonable accommodation was possible, this court does not need to examine whether ICEE acted in good faith in the interactive process.")

As Reed cannot identify a possible reasonable accommodation, summary judgment cannot be defeated based upon Reed's allegation that BEK was lackluster in the interactive process.   *See Adair,* 823 F.3d at 1311 ("in a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant-even if it also appears that the defendant failed to engage in good faith in the interactive process'")(*quoting Donahue v. Consol. Rail Corp.*, 224 F.3d 226, 234 (3d Cir. 2000); *Iverson v. City of Shawnee,* 332 Fed.Appx. 501, 504 (10th Cir. 2009)(employee must establish the interactive process would likely have produced a reasonable accommodation).

The record may not reflect a textbook interactive process.  However, the record proves Reed and BEK communicated about his job, his medical restrictions, and whether those restrictions could be reasonably accommodated.  The record reflects Reed knew BEK had decided it could not accommodate his permanent restrictions.  With no evidence that additional communication between them would have altered the outcome, summary judgment cannot be denied.

## IV.  CONCLUSION

WHEREFORE, Defendant Ben E Keith Company respectfully requests that summary judgment be granted in its favor and that it be awarded its fees, costs, and all other relief to which it may be entitled.

Respectfully submitted,

DOERNER, SAUNDERS, DANIEL
    & ANDERSON, L.L.P.


By: *s/Kristen L. Brightmire*
    Kristen L. Brightmire, OBA No. 14239
    Rebecca D. Stanglein, OBA No. 22723
    Two West Second Street, Suite 700
    Tulsa, Oklahoma 74103-3117
    Telephone (918) 591-5204
    Facsimile (918) 925-5204
    kbrightmire@dsda.com
    rstanglein@dsda.com

    *Attorneys for Defendant*


## CERTIFICATE OF SERVICE

    I hereby certify that on September 22, 2016 I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

    mitchell@shamaslaw.com

            *s/ Kristen L. Brightmire*

3946323v2